The next case this morning is 23-1399, United States v. McGregor, counsel for the appellant. If you'd make your appearance and proceed please. During a routine traffic stop in broad daylight, officers searched Mr. McGregor's vehicle for weapons without a warrant, claiming they had reasonable suspicion that he was armed and presently dangerous. In upholding the protective sweep, the district court relied on three facts. First, Mr. McGregor's reach into the passenger side of his vehicle as he was pulling over. Second, his prior robbery conviction. And third, that officers recognized him as a gang member. This reach was innocuous. It was supported by multiple innocent explanations and it was completed before officers reached the vehicle. At most, it gave officers a hunch Mr. McGregor was hiding something. And the status factors here, which travel with Mr. McGregor every time he gets in a car, can't transform that hunch into reasonable suspicion that he was armed and presently dangerous in the moment. Counsel, do you have any arguments, are you advancing any arguments challenging the district court's factual findings as clearly erroneous? No, Your Honor. We accept the district court's factual findings as to the nature of the reach and we aren't making any challenges. Are you inviting this court to look beyond the findings that the district court made in support of your argument? No, Your Honor. I don't see us doing that. We would say that the government has asked this court to make fact findings on matters that were disputed below, specifically whether Mr. McGregor was slow to stop under the circumstances. We would say that this court, in the first instance, cannot resolve those types of factual disputes. And our support for that is in the United States v. Denison, this court said it could not affirm a district court's finding that the search at issue was instant to arrest because the district court hadn't resolved a necessary factual dispute and the court said we can't act as fact finder. We're saying here the district court didn't resolve the dispute about whether Mr. McGregor was slow to stop under the circumstances and this court can't resolve it in the first instance. Counsel, let me ask about status factors that, as I understand it from what you just said, you perceive as following him wherever he goes. On the gang affiliation one, at least as I recall the record, there was both what they found in the database, but there was also some evidence that he was at at least two funerals involving gang members. Now, were those, do you know, were those funerals reasonably close in time to the stop? Your Honor, we don't know anything about those funerals. We don't know who was there, how many people were involved at the funerals. It's from counsel Below's description, it sounds as if there were multiple people there who had passed away and multiple community members as well, but no, we don't know when those funerals were. And just to clarify, the fact that the officer said that there was a database involved, he was talking about a general knowledge base, not a specific database. This is different from cases where this court has relied on gang membership where someone's in a documented gang member in an actual police database. Here we're talking about just a general knowledge base. So he's talking about just intelligence, general intelligence among the officers who do this kind of work.  Well, what I'm trying to get a better sense of is whether there is any way to identify whether this gang status was deemed to be contemporary or not. I mean, in the sense that, I mean, your argument has a little bit of persuasive force if you're saying status factors that follow him wherever he goes. If he were a gang member 30 years ago, you know, he founds whatever, you know, higher power there is and he comes out and 30 years later, he's still got, he's stuck with this moniker even though he is really no longer affiliated with gangs. And so what I'm, so that being the range of what I'm talking about, is there any way to get a sense of, as you know, and I'm going to ask government counsel this too, any way to get a sense of whether we could say he was a current gang member? Your Honor, I don't think so on this record. I don't see anything. I see the officers recognizing him and having gone to these gang funerals. We don't know when those searches, those social media searches were. They didn't testify as to, with any particularity about what those searches were. So there's sort of this nebulous thing that they recognize him as a gang member and possibly it's contemporaneous in that they're, you know, I don't know how old everybody is, but you know. Well, that's it. I mean, if there isn't a hard file, you know, some sort of database that actually cuts against the notion of it being, well, it cuts against the notion of it, well, it's more likely to be contemporary if it is in fact in people's heads. I think I agree with that, but it also is, it's less, it's sort of less reliable. So if someone's in a gang database as a documented gang member, they might have stronger gang ties. There might be actually more there than here where we're going off this kind of nebulous information about attending a funeral. And then this vague testimony as to whether, what their searches were that they were doing. But even, I would say even if it's somewhat contemporaneous, we don't have any additional factors. And this court said in Hammond, you need some, for status factors to bear a meaningful weight in the analysis, you need something about the particular circumstances of the stop that interact with that status factor to show that the person is, you know, in this context acting in their capacity as a gang member. Are you asking us to develop the law on that point, or are you arguing under the existing framework? I don't see that as asking to develop the law. I think Hammond is clear that status factors, you can't just arrest someone, or excuse me, search their vehicle based on who they are and their past. And those factors really only play meaningful, a meaningful role in the analysis when there's something about the stop that's tying them to the present moment and showing present potential for weapons possession and present potential for violence. And so in Hammond, it was that the person was effectively dressed in what sounds like a uniform, a gang uniform, during an ongoing feud, and then was driving around in the car that was seized in connection with a weapons suspicion offense. And he was arrested on that offense. And so those sort of factors aren't present here. We don't have anything that's tying Mr. McGregor's, whether contemporaneous or not, his gang membership to- I'm sorry, whether contemporary or not, if it is contemporary, and if there is some reason to believe, reason, objective reason to believe it is contemporary, why isn't just being in a gang, and we're not talking about gangs that, you know, do charity work, I mean, by virtue of being in a gang, in and of itself, a whole bunch of stuff comes with that, and it isn't good. I mean, including that, you know, violence, potential access to weapons, all those sorts of things. So just whether, if it is contemporary, and if there is some reason to believe it's contemporary, why isn't that enough? I mean, even under what you described in Hammond, he wouldn't have to be wearing gang insignia for that to do it, right? I see this court's case law when you're giving substantial weight to factors like gang membership where, presumably, a person has another, like, maybe they're a gang member, but they also have what we might consider a normal life, where they're not acting in their capacity as a gang member. Where this court has given substantial weight to gang membership is, you know, where someone has, there's present indicia that they are acting as a gang member with, for which they might be armed and predisposed to violence. So in, we've covered Hammond, but in Amaya, someone's trapped, the passenger was traveling with, they left a suspected drug den, the passenger is traveling with a known drug dealer, he's documented as a gang member, he's wearing gang colors. There the proximity to drug activity, and then wearing the gang colors, again, is like, it contributes, it brings it into the present. That makes it a really cool, great case, but that doesn't mean that you have to have that, right? I mean, it could be something less than that, particularly when it's not the sole factor that the district court relied on here. I mean, the district court relied on the gang affiliation, but he also had him saying that he's a convicted felon of robbery, if I recall correctly, which is ordinarily viewed as being a violent crime, and so you have that, and then, you know, you have, we have our Canada decision, and frankly, I find this, at least on its face, and tell me why I'm wrong, I find it more indicative of danger that he is reaching around in an area that he subsequently can actually easily access, i.e. up front next to him, you know, and is pretty occupied doing that, since he's leaning over, I find that much more troubling, you know, being an uneducated person about these sorts of things, than I would be if he was reaching behind him. Your Honor, I think, I think Canada is much more indicative of weapons possession and present violence for a couple of reasons, so as Your Honor described, these, the nature and timing of these two movements is quite different, right? So Canada involves someone reaching behind the driver's seat as the officers are standing next to the car, but he already had his wallet on his lap. There's, it's hard to imagine an innocent explanation for, for doing that, whereas in, in this, this context, Mr. McGregor is reaching into the passenger area, but the officers can't see what he's doing. Yes, but isn't that the problem? Go ahead. No, you go ahead. But he can see them, right, and, and, and to borrow from my learned colleague here, isn't it a problem that they can't see what he's doing? I mean, it would seem that if you're in a situation where you're trying to conceal, arguably for further use, a weapon, why wouldn't you do exactly what he did? He saw the officers, he's, he, he is very busy doing it, he's, you know, he's intent to do something in there. Why wouldn't that be exactly what you would do if you were trying to hide a weapon? I, I think it's, it is remarkably, it's reaching into the passenger area of a vehicle. You're going to use the word innocent? I, I think so. Okay. Your Honor, I think there are good reasons why one might do that. So the undisputed testimony is they're slowing from 50 miles per hour and they've gone over speed bumps. From reviewing Officer Jaworowski's video, there are items in the passenger seat. So there's a bottle of cranberry juice and there are items in the floorboard. Presumably those things would have gone flying. I just did this as I was driving here, but when you slow to a stop, things go flying forward and there is an urge to grab them and put them back where they were. But innocent explanations, you know, don't, don't negate reasonable suspicion, right? So how do you square all of these possibilities, whether or not they, they're true with our case law? Absolutely, Your Honor. The officers don't have to rule out all innocent explanations, but they need more than a hunch. They need more than a hunch and they need more than, we don't know where he was reaching. They, we, to, to base this or to put substantial weight on a reach, you need, you need to be able to, clarity goes to whether the officers, both whether they saw it well enough, but also whether the reach is sufficiently unambiguous to, to justify inferences that the person is reaching in an area where a weapon might be and doing something that's not consistent with preparing for a traffic stop. Can I ask you a, just a question, I want to make sure I understood your argument. Are you contending that it was sort of like a standalone reversible error that the district court here didn't consider mitigating factors, or are you arguing that more in terms of how it informs your totality analysis? The latter, Your Honor. Yes, we, we don't contend that it's a standalone error. We do contend that the, the absence of the discussion of those factors, and here they are different from other circumstances where you have neutral compliance in a tense situation. This is an active attempt to show that Mr. McGregor was non-threatening. It's in broad daylight, in an area that's not described as high crime, and we, we think the district court didn't give sufficient weight, and we're just pointing to the fact that it didn't discuss them whatsoever, but not as a standalone error. If the court doesn't have further questions, I'll reserve the rest of my time. Thank you. Thank you. May it please the Court, Chief Judge Holmes, Judge Carson, Judge Rossman, Jess McKeel on behalf of the United States. Your Honors, I think this brief, the briefing kind of teed this up as Canada Part II, but Canada involved two factors, furtive movements and a slow roll, and I would submit that here we've got probably eight, maybe even nine factors. I'm just going to quickly... But, but Canada involved a dark, rainy night in what officers described as a high crime area. Your Honor, that is true, but in terms of the court's analysis, those, those were factors that were listed, and actually, in the briefing in Canada, the government submitted that high crime should be considered as an additional factor, even though it wasn't weighted by the district court. But ultimately, the Canada opinion came down to, as Judge Rossman pointed out, a totality of two, furtive movements and slow roll, and I know there's disagreement about, you know, how suspicious each of those two independent factors were, but we've got a lot more factors than that here. Didn't the court focus on three, though? In Canada? No, in this case. In, oh, in this case, I would say we've got at least four. If we turn to page... That doesn't answer the question. I thought the court spoke to, didn't, it didn't deal with the slow roll, alleged slow roll. It made no finding as of one way or the other on that, did it? You disagree with that? I do disagree. It did, I would submit it did make a finding. What finding did it make? So there, it's undisputed, if you look at page 93 of the transcript, volume 3, undisputed that this took 17 seconds to stop. The district court asked counsel, well, you know, how long did it take, 17 seconds. Well, that's a fairly long time. And then we've got page 92, the page before it, where the court is clearing up this distinction between one officer calling it a slow roll, the other calling it an abrupt pulling over. And the district court said, well, looking at the defense's exhibit A, the map, that belies any notion of an abrupt pulling over. Now, if you, if you look at Officer Jaworski's testimony, he said, you know, this car abruptly pulled over. But taking even, you know, that label off, because at bottom, these are all labels. But there's, there's conflict in the testimony about, not that it was 17 seconds necessarily, the fact is perhaps undisputed, but how to characterize that fact. There was disputed testimony about that. And the district court said, based on the map, the defense exhibit A, that it does not suggest an abrupt pulling over. Because that's at least two blocks, according to Jaworski, and if you look at this map. And when it articulated, when the district court articulated the factors that it, from which it derived its conclusion of reasonable suspicion, was that one of them? It was not in it. And what, so what I would start with the factors that, again, take this above and beyond Canada, you look at page 145, and it's not three factors, it's, it's four. We've got leaning over to the right in a way that he thought was unusual and dangerous. So that. The district court didn't consider that either. I mean, before you enumerate the facts that you think are more comprehensive than the ones in Canada, why should we look beyond what the district court found here as the basis for its legal conclusion? So I guess before we, you're saying, before we even get to the facts that the district court relied on. No, my question is, you seem to be arguing, the government's position is, there's a whole lot more going on here to support reasonable suspicion than there was in Canada, is that what you're saying? That is fair. Okay, and it seems to me that you're beginning to enumerate facts that go outside of the ones that the district court relied on to conclude that there was reasonable suspicion. Your Honor, where I was going to start actually is the facts that the district court relied on. The three facts. There's four. Okay, so you're contending that the district court made a factual finding about a slow roll. No, what the four facts are on page 145, the first is this extreme exaggerated lean over to the right, which is, I mean, they described it as excessive, you know, his whole body disappeared from view. And they weren't far away. They were about the distance from counsel's table to you all, about 20 to 25 feet. And he disappeared from view while he's still driving. Secondly, they knew that he was a gang member. Third, they believe that local gang members were armed. Fourth, he overheard the statement that the defendant was on parole. And looking at the rest of the judge's order, it's clear that what we're talking about is on parole for robbery. You could even splice those out into two additional factors. On parole, that suggests, and the defendant says on the video, oh, I don't carry weapons because I'm on parole. Okay, well, there's some suggestion here. What are you reaching to do? What are you hiding? So the parole factor and the fact that he is a prohibited person does tend to suggest that he is armed. Secondly, this violent robbery, that suggests that he's dangerous. Why violent robbery? I mean, he says he's on parole for robbery. But a robbery is categorically violent under Colorado law. And if, you know, this kind of goes to actually the 922G argument, which is preservation, but we've kind of fleshed out what that robbery was. And if you look at the nature of that robbery, it's pretty bad. It's a carjacking. It's pistol whipping. It's shooting. None of that was known to the officers at the time. No, no, no. But I'm pointing out that if we want to talk about whether or not this was violent, factually it was violent, categorically it was violent. Talk to me for a second, perhaps you have some information on the gang member status affiliation. What basis was there to know from the record whether that was a contemporary designation or status designation? I mean, was this he was a gang member 30 years ago or was he a gang member as they, as far as the officers knew now? And that's a fair point. He's 23 years old. So he's definitely not a gang member 30 years ago. This is all fairly recent stuff that we're talking about. These gang funerals, according to their own motion to suppress, they attach the officer's report. The gang funerals were within the past year. We're also talking about- Okay. So help me on that. The gang funerals were in the past year. That's based upon what evidence are you- That's at page one, sorry, 13, record volume one. It's attached to the motion to suppress.  Secondly, we're dealing with social media. So we're not talking about age old reports here. Third, these officers are gang unit officers that develop a knowledge database from surveillance, social media, open source, going to these funerals. They knew exactly who Clover was. They knew who he was. And I would point to this court's decision in Minners, where there was a discussion of whether the evidence of somebody's gang membership was reliable. The court called that irrelevant for purposes of a long protective sweep. The question is, do these officers have reasonable suspicion that this individual is armed and  And this isn't looking, trawling for evidence. This is to try to maintain the status quo, to separate the person from the weapon. That's all this was. They quickly peer under the passenger seat. There it is, exactly where they thought he put it. What do you say to the appellant's argument that with respect to gang membership and status like that, that our law actually requires something more related to the incident itself before it can really inform the reasonable suspicion analysis? Well, I think both as to gang membership and then prior record, what I think the defense calls these static status factors, that I would say that the law already says that they are relevant. The question is, how relevant? How much weight do we put on these? And the law says they become especially relevant, critically relevant, when they are tied to circumstances of the stop. And so here, what are some of the circumstances? Well, we know that he's reaching all around. We know that he's on parole for robbery. We know that he's racing to get to his urinalysis. We know that, you know, again, this is getting to a fact that I think is undisputed, that it took him 17 seconds on a very open roadway where there are plenty of places to pull over. If you look at the video, plenty of places to pull over. These are all starting to form together some suspicion that this person is armed. Now we throw in the factor of these local gang members tend to be armed. So we know that he's a gang member. These gang members tend to be armed. Those things are working in conjunction with each other. And if we want to have some flavor for just how dangerous this gang is, I would invite the court to look at, again, that same document attached to the motion to suppress. Volume 1, page 14. The Seanville has been extremely violent criminal street gang involved in armed robberies, carjackings, high speeds, pursuits, aggravated assaults, has active beefs with various gangs. And but our analysis has to be on what was reasonably, objectively understood by the officers on the scene, right? Yes. And reasonably, objectively believed that he was a gang member. They recognized him as they're walking up to the vehicle. This wasn't some post hoc rationalization. They recognized Clover McGregor as a gang member and they recognized him as being a member of this gang that you that the report shows to be violent. Right. Correct. Your Honor. And this is also not just a violent gang. This is, again, gang members that tend to be armed. They had every reason to believe that he had a gun in that vehicle. This was not an unparticularized hunch. Again, reasonable suspicions, a pretty low bar, and this far, far goes above that bar. Even if we're just looking at that limited universe on page 145 of the facts found by the district court. You know, we got parole, robbery, dramatic and breach. I mean, we can call it a furtive movement if we want, but I don't know how helpful that label is. I think the briefing delves into furtive movements and Canada goes there as well. A furtive movement could mean just sort of like winking at you, doing a little elbow nudge or a furtive movement could be diving across the seat while you're still driving, body completely disappearing from view. Some movements become a little bit more suspicious than others. Could you speak to, let me ask you this. You agree that appellate courts don't find facts, right? I agree with that, Your Honor. And so what are the limits that the government would contend are operable here in terms of if we were to look beyond the four, the three main things that the district court relied on to form its legal conclusion? Is it just the record's fair game? We can just make factual findings? What kind of constraints would the government say are upon us? I would think the constraints are if the facts are undisputed. I think that if there's a factual dispute, I agree. It's not for this court to kind of wade into those waters. So in terms of a factual dispute, if the district court didn't make that determination that it believed Officer Grzeska more than Officer Jaworski in terms of whether it's a slow roll or an abrupt pulling over, you know, that label may not be fair game for the court to go into. But it is still fair game for this court to say, yeah, 17 seconds, that's an awfully long time. Let's think about Canada, which was 14 seconds. Canada was 14 seconds and two blocks. Well, to that point, 17 seconds, that's an awfully long time. What that suggests to me is that you're asking us to make a factual inference from 17 seconds. I mean, 17 seconds is a historical fact. But to say that that's an awfully long time provides layers on a level of context. I mean, and that's what you have officers for to say that's an awfully long time or not. That's not, you know, sorry, that's not in my job description. I mean, I don't know whether that's an awfully long time or not, depending on the context of the situation, what could have been going on. I have no frame of reference to make that determination. If it had been an hour, if he kept driving for an hour, I think I could say that. But so the point I'm making is that even if it's undisputed that this historical fact existed, in order to get from that to the fact that it supports reasonable suspicion, there has to be an inference and characterization associated with that. And I don't think as an appellate court, I'm, well, I know I'm not situated to do it. And I don't think that's our role. Well, again, I agree. Officer Grzeska explained why it was a slow roll. And the district court said, well, this, you know, the facts, the Exhibit A, how long this car traveled, tends to support his testimony, as opposed to Joe Warski. That's page 92. And again, even if we take Joe Warski's interpretation, this vehicle, which he said, you know, they put on the lights and siren at about Nile Street on Exhibit A. That means, just look at the distance on here. It traveled about 900 more feet. That's three football fields that this car continued to travel under Joe Warski's, quote-unquote, abrupt pulling over. Now, if we want to then look at Grzeska's testimony, it went three blocks, not just two. And, you know, we're talking now closer to 1,200 feet. That's a long distance. But here's why I don't want to get too caught up on slow roll, because each of these factors layer upon one another. It is the totality. This, you know, again, it's not just that he's a gang member. We're not relying on just that he's a gang member. It's a gang member who's reaching all over, taking 17 seconds to stop while he's disappearing from view in a gang that tends to be armed. He does turn around with a nervous expression. He is fidgeting with his wallet. On the camera itself, the officer says, you know, stop, you're making me nervous. There is this excessive speeding. We're not talking about going 32 in a 25. He's going twice the speed limit through a residential neighborhood, and I'm not sure where we get the, you know, the term peaceful in the brief, but it is next to a school. It is next to a park. This is, there's so many different factors that start laying on top of each other, and I understand counsel's position that we also need to take into account mitigating factors, but those don't move the needle in terms of the reasonable danger to these officers. They took reasonable steps, and I see that I'm out of time if the court has any further questions. No, thank you, counsel. Thank you. Your Honor, I just want to make a couple of points. First, there was no finding that the, that Mr. McGregor was slow to stop under the circumstances. Counsel is pointing to trial counsel below's estimate from the video and the district court's discussion with counsel, but the district court did not make any, anywhere in there, in his description of his findings, resolve the dispute that Mr. McGregor was slow to stop under the circumstances. And I would like to point out that the literal time to stop doesn't mean slow to stop under the circumstances. This is a fact-specific contextual inquiry, and it depends on, for instance, how fast you're going and whether someone's following you. Is it safe to stop? Here, the officer, everyone knows the officers were going 50, sorry, both were going 50, and the officers were following relatively closely. So is there a position that just because we may have said in Canada it was a 14 seconds was a slow roll, that doesn't mean 17 seconds is? Yes. It was a slow roll under the circumstances in Canada. And just to clear the record to the testimony. Let me ask one question about findings of fact. So the court says, right here, page 127, it says, so let me make the following findings of fact. And then he starts talking about what all the officers said. Yes. And he gets to the point where he says that one of the officers testified that because of the fact the driver in the vehicle was not stopping right away, and because, my word's not his, he was using a furtive gesture, he was worried that he was concealing or retrieving something from the passenger seat. Does the fact that that follows the word, so let me make the following findings of fact, I mean, does that mean anything to you? Does that mean that we can't rely on him reciting that? Yes, I agree that he's... Does he have to say, I find that he was right? No, but he also then later on summarizes the other officer's testimony, and he says that that officer testified that the stop was abrupt. And he never goes on to say, I'm resolving this in favor of this was a slow roll under the circumstances, or, and I don't need that to be magic words, right, but he summarizes both officers' testimony. I don't, I don't, I don't want to mistake the record, but I don't see him resolving that dispute anywhere. Thank you, Your Honors. Thank you, counsel. The case is submitted. I appreciate it.